UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------

Civil Action No. 1:19-cv-10354-WGY

------------------------------

JAMES KEOWN,

Petitioner

v.

STEVEN SILVA,
Superintendent, MCI-Norfolk

Respondent

------------------------------

**DEFENDANT'S MEMORANDUM IN SUPPORT
OF PETITION FOR HABEAS CORPUS**

------------------------------

PETITIONER:

James Keown, pro se
PO Box 43
Norfolk, MA 02056

Dated: September 10, 2019

U.S. DISTRICT COURT
DISTRICT OF MASS.
2019 SEP 11  PM 1: 45
FILED
IN CLERKS OFFICE

## TABLE OF CONTENTS

PROCEDURAL HISTORY ........................................ 1

    Statement of the Case ................................ 1
    Statement of the Facts .............................. 3

ARGUMENT .................................................. 7

  I. THE MASSACHUSETTS APPEALS COURT VIOLATED THE
     PETITIONER'S FEDERAL RIGHTS BY NOT CORRECTING FOR
     THE PROSECUTOR'S MISSTATEMENT OF A CRUCIAL AND
     INFLAMMATORY FACT NOT IN EVIDENCE DURING CLOSING
     ARGUMENT AND HIS USE OF JULIE KEOWN'S EMAILS FOR
     THEIR TRUTH WHICH DENIED MR. KEOWN DUE PROCESS OF
     THE LAW AND A FAIR TRIAL AND RESULTED IN A
     SUBSTANTIAL LIKELIHOOD OF A MISCARRIAGE OF
     JUSTICE. ......................................... 7

  II. THE MASSACHUSETTS APPEALS COURT VIOLATED THE
     PETITIONER'S FEDERAL DUE PROCESS RIGHTS BY NOT
     ALLOWING MR. KEOWN'S MOTIONS IN LIMINE TO EXCLUDE
     EVIDENCE REGARDING "KAISER SOZE", HIS PRIOR BAD ACT
     AND GOOGLE SEARCHES DONE ON A LAPTOP AND BY ALLOWING
     THE COMMONWEALTH TO INTRODUCE JULIE KEOWN'S
     STATEMENTS AND EMAILS OVER DEFENSE OBJECTION. ... 11

    A. Evidence as to the name "Kaiser Soze" as a
       username on a laptop and a wireless connection
       was enormously prejudicial because the jury could
       and did infer that Mr. Keown was like the
       infamous fictional character. ................ 11

    B. Evidence that Mr. Keown was fired by his employer
       for diverting funds and that he lied about being
       admitted to Harvard was more prejudicial than
       probative of any motive to kill his wife. .... 15

    C. Julie Keown's statements and emails were not
       probative of Mr. Keown's state of mind and were
       only marginally probative on the issue of
       suicide, which was first raised by the
       prosecution, not the defendant, and were
       intensely and unfairly prejudicial to
       Mr. Keown. ................................... 19

    D. Evidence of Google searches on a laptop was more
       prejudicial than probative when that computer was
       available to both James and Julie Keown and there
       was no direct evidence who did the actual
       searches.................................... 25

III.  THE MASSACHUSETTS APPEALS COURT VIOLATED THE
      PETITIONER'S FEDERAL DUE PROCESS IN ALLOWING TO
      STAND THE JURY'S ABILITY TO INFER MALICE/INTENT
      TO KILL FROM THE USE OF A WEAPON WHICH WAS NOT
      INHERENTLY DANGEROUS....................... 27

IV. THE MASSACHUSETTS APPEALS COURT VIOLATED THE
    PETITIONER'S FEDERAL RIGHTS BY FAILING TO UPHOLD
    FEDERAL DECISIONS RELATED TO THE SEARCH OF DIGITAL
    DEVICES. ........................................ 30

    A. The warrant to search the Sony Vaio laptop was
       not supported by probable cause because the
       affidavit did not provide a substantial basis to
       believe that the digital device contained
       evidence related to the murder charge. ....... 30

    B. The warrant allowing the search of data in the
       digital device was insufficiently particularized
       due to a lack of a digital search protocol, which
       created an impermissible general warrant. ..... 33

    C. Reasons why this Court should review the
       petitioner's Fourth Amendment claims. ........ 38

CONCLUSION ............................................ 42

## NAMES AND CITATIONS

Because James Keown and Julie Oldag Keown shared the same last name, this brief will refer to them by their first name.

"T#" refers to the transcript and day of the trial evidence.

"MTS#" refers to the transcript and volume of the motion to suppress hearings.

"MIL" refers to the transcript and volume of the motion in limine hearings.

The numbers following the colon refer to the cited pages in the cited volume.

## PROCEDURAL HISTORY

## STATEMENT OF THE CASE

On November 3, 2005, a Middlesex County grand jury returned an indictment against the petitioner, James Keown ("James" or "Mr. Keown"), for one count of first-degree murder of his wife Julie Oldag Keown ("Julie") in violation of Mass. G.L. c. 265, §1. On November 7, 2005, Mr. Keown was arrested in Jefferson City, Missouri, and returned to Massachusetts where he was arraigned on November 10, 2005. At his arraignment, attorney J.W. Carney was appointed to represent Mr. Keown.

On January 4, 2016, a Motion was allowed instructing Carney to turn over items in his possession, including a laptop and hard drive that belonged to Keown. A State Trooper took possession of the items that day under the stipulation that the digital devices not be searched until all of the files protected under attorney-client privilege could be sequestered.

Six months after taking possession of the materials from Carney's office, the Commonwealth applied for and was granted a search warrant on June 8, 2006, to search a Sony Vaio laptop and Western Digital hard drive. The drive did not mention the possibility of attorney-client privileged documents. The next day a return on the warrant was sent to the Court and State Trooper David McSweeney began a months long search of the digital devices.

On November 20, 2006, the Court allowed a Motion to

1

Withdraw from Attorney Carney after it was discovered that he had turned over digital devices that were not covered under the Court's previous Motion. Attorneys Matthew Kamholtz and Matthew Feinberg were appointed as new counsel for Keown.

On August 6, 2006, the Commonwealth's computer expert, Andrew Winrow, searched the computer for possibly protected files. He showed Carney the files he had discovered and agreed to sequester them from any future searches.

On May 22, 2007, Feinberg and Kamholtz filed a Motion to Suppress several items including the digital devices turned over by Carney. Following an 8-day suppression hearing, the Motion to Suppress was denied. The denial was appealed to a single justice of the Massachusetts Supreme Judicial Court, which upheld the denial.

On November 20, 2006, the Court allowed a Motion to Withdraw from Attorney Carney after it was discovered that he had turned over digital devices that were not covered under the Court's previous Motion. Attorneys Matthew Kamholtz and Matthew Feinberg were appointed as new counsel for Keown.

On February 11, 2008, Feinberg and Kamholtz filed a Motion in Limine to prevent the use of certain prior bad acts and the username "Kaiser Soze" at trial. The Motion was denied.

Following a 17-day trail, Mr. Keown was found guilty of first degree murder on July 2, 2008.

On December 30, 2016, Mr. Keown filed an appeal of his conviction with the Supreme Judicial Court. The case was argued on February 10, 2017, and the Court upheld Mr. Keown's conviction on October 23, 2017.

On January 22, 2018, Mr. Keown file a Writ of Certiorari with the United States Supreme Court. On February 20, 2018, the Court denied Mr. Keown's petition.

## STATEMENT OF THE FACTS

In January 2004, James and Julie moved to Massachusetts from Missouri. James worked for the Learning Exchange and Julie was a nurse and software specialist with Cerner. Both continued to work these jobs remotely. James and Julie had a good relationship.

The couple told two different stories about the move: that it was for the purpose of James attending Harvard University to finish his undergraduate degree, or that James was accepted at Harvard Business School (T4:160). In reality, James was not admitted to Harvard University or Harvard Business School and took only one class at the Harvard Extension School (T9:9, 18, 22). The Harvard acceptance letter James showed to the Learning Exchange was a fake (T8:106, T9:20).

In July 2004, James was fired from the Learning Exchange when his employer found out that James had contracted with Jason Jett to build a website for the company but did not pay him and instead diverted the company

3

website funds to a company owned by James (T8: 112-118). In August and September 2004, the couple's financial records showed very little money in three of their bank accounts, and some negative balances (T12: 23-25). The Commonwealth's theory was that Julie didn't know about the Harvard, Learning Exchange or financial matters and that keeping her from finding out was the motive for the murder (T13: 71).

Julie was first hospitalized at Newton-Wellesley Hospital on August 20-23, 2004 (T5: 66). She was hospitalized again on September 4, 2004 (T5: 72). On both occasions, it was James who had discovered Julie ill and rushed her to the emergency room to seek treatment. Julie died on September 8, 2004 (T4: 200).

The Commonwealth's medical expert, Dr. Bazari, opined that Julie's first hospitalization was caused by a mild ethylene glycol ("EG") overdose and the second hospitalization was due to a fatal overdose of EG (T5: 79). The most common source of EG is antifreeze (T7: 131). The defense medical expert opined that the first hospitalization was not due to EG poisoning, but agreed that he second hospitalization was so caused (T6: 17, 40). It was argued that if Julie had received treatment twelve hours earlier than she did, she would have survived (T5: 76). James, however, had admitted Julie to the hospital twelve hours before the hospital began treating her for an EG overdose (T5: 104). James had even called Julie's mother around 4 PM on September 4, 2004, to say that doctors wanted Julie to go

4

to the hospital, but that she did not want to go (T12: 155-156).

James told Julie's mother on September 5, 2004, that he didn't know how Julie had gotten antifreeze in her system (T4: 197). He said the only thing he could think of is that Julie had picked up a bottle containing EG when she left the house unbeknownst to him and went for a walk alone on the evening of September 3, 2004 (T4: 197-198). On September 7, 2004, James spoke with police. He told them that Julie was on prednisone, which sometimes caused her to space out (T6: 164), and that on Friday September 3, 2004, around 8 PM, he went upstairs to the office the couple shared in their townhouse, and when he came back down, Julie was gone (T7: 166). He was preparing to get in the couple's vehicle when James saw Julie walking up the street (T7: 166). When James asked Julie where she had been, she said that she went for a walk around the area (T7: 166). The next morning, Julie awoke around 5 AM, logged on to her work computer, and began researching hospitals other than Newton-Wellesley, as well as reviewing driving directions. When James awoke later in the morning, Julie reported that she did not feel well, but refused to go to the hospital. Instead, she asked James to go to the grocery store and drug store for her. Later that evening, James discovered Julie's condition had worsened and took her to the hospital at 8:30 or 9 PM (T6: 181, T7: 167-172).

On September 7, 2004, James agreed to let police search

5

the couple's home (T7: 176). No antifreeze or EG was found, then or ever (T7: 178). At the time of her death, Julie had life insurance in the amount of $250,000 of which James was the beneficiary (T11: 171-173). After Julie's death, James made no attempt to collect on Julie's life insurance policy.

During the investigation, James maintained that he did not know how Julie had come to ingest EG, nor had he seen her drink anything out of the ordinary. Julie's mother thought there was a possibility that Julie had committed suicide (T4: 226-227).

The Keown household had several digital devices. Among the devices in use at the time of Julie's death were two laptops belonging to Cerner, which Julie used primarily for work (T10: 123). There were two desktop computers, a PC desktop computer and an Apple Macintosh, on the desk James primarily used for work. Another computer in the house was a Sony VAIO laptop, which the Commonwealth sought to prove was used only by James (T13: 76). A computer forensics expert found numerous Google searches for poisons and a search purportedly done on August 18, 2004, for "antifreeze death human" on the Sony VAIO (T9: 213-214). No poison Google searches were found on the Cerner laptops (T11: 16-20).

Additional facts will be discussed in the brief where relevant.

6

### ARGUMENT

I. The Massachusetts Supreme Judicial Court violated
   the Petitioner's federal rights by not correcting
   for the prosecutor's misstatement of a crucial and
   inflammatory fact not in evidence during closing
   argument and his use of Julie Keown's emails for
   their truth which denied Mr. Keown due process of
   the law and a fair trial and resulted in a
   substantial likelihood of a miscarriage of justice.

The verdict against Mr. Keown was influenced, and his
federal due process rights to a fair trial were violated, by
the prosecutor's impermissible conduct in closing argument.
See U.S. Const. amend. XIV, §1; Darden v. Wainwright, 477
U.S. 168, 181 (1986) (question to be resolved is whether the
alleged prosecutorial misconduct "so infected the trial with
unfairness as to make the resulting conviction a denial of
due process"). Reversal is warranted because the remarks
were a flagrant abuse, United States v. Farmer, 583 F.3d 131
at 147, creating a substantial likelihood of a miscarriage
of justice.

In closing argument, the prosecutor mislead the jury
about the two crucial and most inflammatory pieces of
evidence at trial: that under the user name "Kaiser Soze,"
Mr. Keown had done a Google search for "ethylene glycol
death human" (T:13 77). This was horribly wrong.

The only information about this search that the

7

Commonwealth's computer expert, State Trooper Andrew Winrow, testified to was that the Google search was "antifreeze death human" and it took place on August 18, 2004, at 2:44 PM Greenwich Mean Time (T9: 213-214, T10: 8-9). There was no evidence under which user name this search happened, nor was there any direct evidence as to who did this search (T10: 32). It was clear error for a prosecutor to misstate this crucial evidence in his closing argument. This remark was calculated to do one thing: to equate Mr. Keown with the dangerous, frightening, and murderous fictional character "Kaiser Soze" from the popular 1995 film "The Usual Suspects." See infra pp.12-13. The prosecutors misstatement sought to sweep jurors beyond a fair and calm consideration of the evidence. The prosecutor erroneously and in a stunningly prejudicial fashion linked the fictional personal of "Kaiser Soze" to Mr. Keown for the truth of his character and actions. See Farmer, 583 F.3d at 146-147 (reversible use of the nickname "Murder" in closing argument). The prosecutor's misstatement on these two crucial and inflammatory points went to the heart of the wholly circumstantial case against Mr. Keown.

In addition, the prosecutor quoted extensively from Julie's statements in her emails in his closing argument in a way that appeared to be relying upon them for their truth when they were admitted for the limited purpose of state of mind (T13: 54-61, 83; Add. 9-17) The prosecutor wound up into a fever pitch when he ended these remarks with, "This

8

was murder. And don't take my word for it. Take hers" (T13: 51). A prosecutor may not present to the jury evidence admitted for a limited purpose as if it were substantive evidence.

The prosecutor's strategy of making James out to be a "Kaiser Soze" while googling "ethylene glycol" and that they should take Julie's "word for it" that her husband killed her was designed to get a first-degree murder verdict by inflaming the jury against James. Because the prosecutor intentionally misused for character assassination evidence meant for a limited purpose, this went to the heart of this wholly circumstantial case and the jury could not and did not overlook it. A jury question concerned "Kaiser Soze" ("I know we are not supposed to discuss Kaiser Soze, however, can we just relate to the jurors who don't know who Kaiser Soze it what the fictional character is?" (T15: 12)). The fictional character was clearly on their minds, thanks in large part to the prosecutor's misconduct.

The prejudice resulting from the prosecutor's improper argument was not deflected by the general, boilerplate instructions given here. Prior to opening statements, the trial judge instructed the jury that the opening statements of the attorneys were not evidence (T4: 11). The trial judge also instructed that the jury should not consider any fact mentioned by counsel that did not come into evidence (T4: 11). During the final charge, the trial judge repeated this instruction, (T13: 94), along with an admonition that

9

closing arguments were not evidence (T13: 93). The trial judge's general instructions did not specifically address the prosecutor's erroneous connection between the two most inflammatory points of evidence, and were wholly inadequate to address the error.

The prosecutor's case was weak, wholly and completely circumstantial and not at all overwhelming. The prosecutor's flagrant play to the jury's emotions by equating Mr. Keown with a demonic fictional character, misstating the evidence on the most damning Google search and suggesting that the jury take Julie's "word for it" that James killed her so infused the trial with inflammatory prejudice that it rendered a fair trial impossible. See Petrillo v. O'Neill, 428 F.3d at 44 n.2. James's conviction violated federal due process and resulted in substantial likelihood of a miscarriage of justice. A new trial is required.

10

II. **The Massachusetts Supreme Judicial Court violated the petitioner's federal due process rights by not allowing Mr. Keown's motions in limine to exclude evidence regarding "Kaiser Soze", his prior bad acts, and Google searches done on a laptop and by allowing the commonwealth to introduce Julie Keown's statements and emails over defense objection.**

Prior to trial, defense counsel filed a number of motions in limine. At trial, defense counsel preserved all of his motion in limine objections when the trial judge allowed him, with the assent of the prosecutor, to preserve his "appellate rights" with one objection (T4: 159-160).

A. Evidence as to the name "Kaiser Soze".

It was an abuse of the trial judge's discretion and a violation of due process to admit evidence associating James with the name "Kaiser Soze". See U.S. Const. Amend. XIV, §1. That name was unfairly inflammatory, it was more prejudicial than probative and other evidence of James's use and control of the computers at issue was readily available. The prosecutor's incorrect use of the "Kaiser Soze" evidence during closing argument, see infra pp. 7-10, compounded the unfair prejudice to James.

At trial, the prosecutor sought to admit evidence that the Sony VAIO laptop contained the user name "Kaiser Soze" which was used before and after Julie's death (T9: 188), and under which numerous Google searches were done after Julie's

11

death (T9:188, 207-209). Also, the Commonwealth sought to prove that a laptop signed out to James by a former employer had once connected to a wireless network named "Kaiser Soze" (T6: 8, T8: 60-61). The Commonwealth exhibited an enormous blow-up of a "screenshot" showing the words "kaiser soze" to the jury (T8: 58-59). The evidence ostensibly was admitted to show James's control of the computers at issue, yet not evidence was ever presented to show that James had created the "Kaiser Soze" user name on the Sony VAIO or who owned the wireless network called "Kaiser Soze" that the work computer had once connected to (T8: 58).

Kaiser (or Keyser) Soze is a character in the extremely well-known 1995 film "The Usual Suspects". The prosecutor acknowledged the problem in using the name "Kaiser Soze":

When you figure out at the end of the movie that Kevin Spacey, who plays a grifter in the movie, as he walks away from a police station is in fact Keyser Soze, this arch-criminal or murderer, who is walking away from a police station having gotten away essentially with multiple murders. There's also actually a scene in the movie which is a flashback at the beginning of the movie which is less obvious to people who have watched the movie but where Keyser Soze is alleged to have murdered his own wife and all of their children but one in order to get away and continue on his criminal enterprise. So for obvious reasons, counsel is concerned about that, and I certainly acknowledge that

12

concern (MIL2: 82).

Defense counsel filed a motion in limine seeking to exclude this evidence on the basis that it was more prejudicial than probative and that the jury would infer that Mr. Keown created the user name "Kaiser Soze" because he was like the character in killing his wife and being a master of deception. The trial judge allowed the "Kaiser Soze" evidence in "with restrictions" saying, "I am not inclined... to allow anything more in other than the name and give a strong limiting instruction to the jury, but I'm certainly not going to allow the Commonwealth to go into what it's about" (T3: 216). Defense counsel objected at trial to the "Kaiser Soze" evidence (T8: 56, T9: 143-144).

Even relevant evidence should not be admitted if its probative value is outweighed by the danger of unfair prejudice. Popular movies can be reference points for how issues in the criminal law are viewed. The "Kaiser Soze" character has been cited as an example of evil. See United States v. Vrancea, 2015 WL 5725883, *21 (E.D.N.Y. 2015) ("There is good news and there is bad news. The good news is that Keyser Soze is a myth. The bad news is the Defendant is not.")

The instructions given by the trial judge were no help in mitigating the prejudice. The limiting instruction given by the trial judge could be misinterpreted by the jury to think that "Kaiser Soze" was the "identity" of Mr. Keown:

And members of the jury, this is being offered to show

13

-- for the purpose of showing the identity of a user of
the computer (T8: 58)

In the final jury instructions, the trial judge twice warned
the jury not to speculate on the meaning of "Kaiser Soze",
but these instructions mainly succeeded in reminding jurors
of that evidence (T13: 118; T15: 12-14). Indeed, a jury
question asked whether the jurors who knew the fictional
character of "Kaiser Soze" could tell the other jurors about
the character. See infra p. 9. In addition, the prosecutor's
closing argument compounded the "Kaiser Soze" prejudice by
incorrectly telling the jury that the most damning Google
search was done under the Kaiser Soze user name. See infra
pp. 7-8.

The trial judge's actions were clearly shaded by her
unfamiliarity with the movie "The Usual Suspects" and the
infamous character "Kaiser Soze". The trial judge made clear
on the record that when making her rulings on the "Kaiser
Soze" issue, she didn't recognize the name at all (T8: 56).
She stated, "I know nothing about the movie" other than what
her law clerks told her about it (T6: 8). The trial judge
should have viewed the movie "The Usual Suspect" or relevant
excerpts from the movie that highlight the "Kaiser Soze"
character rather than just listening to descriptions of the
issue give by her law clerks or the prosecutor. By failing
to acquaint herself with the "Kaiser Soze" character, the
trial judge could not appropriately consider how intensely
prejudicial the association with "Kaiser Soze" would be to

14

Mr. Keown in weighing the evidence's negligible probative value. Thus, the trial judge made a clear error of judgment in weighing the factors relevant to the decision to admit the "Kaiser Soze" evidence, such that her decision was an abuse of discretion.

Despite the limiting instructions that the jury was to disregard any significance of the name "Kaiser Soze", (T13: 118; T15: 12-14), in this case and under these facts, no limiting instructions no matter how strongly worded could have eliminated the taint of the association with the fictional character. This evidence had the sort of "gripping quality" that "may be tantamount to asking the jury to ignore that an elephant has walked through the jury box" (Commonwealth v. Flebotte, 34 Mass. App. Ct. 676, 680 (1993), S.C., 417 Mass. 348 (1994)).

The prosecutor's use of the name "Kaiser Soze" was calculated to appeal to the jury's prejudice against that murderous character, and thus to convict Mr. Keown for associating himself with this persona. See United States v. Farmer, 583 F.3d 131, 146-147 (2nd Cir. 2009). The erroneous admission of this evidence and the prosecutor's incorrect linkage of "Kaiser Soze" with the most damning Google search, resulted in an unfair trial violative of federal due process rights. U.S. Const. amend. XIV, §1. A new trial is warranted because the erroneously admitted evidence significantly weakened the petitioner's case.

B. Prior Bad Acts of Mr. Keown

15

The Commonwealth succeeded in getting the following prior bad acts of Mr. Keown into evidence in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution:

- That in the fall of 2002, James contracted with Jason Jett, a college friend, to build a website for his employer, the Learning Exchange, but James did not pay the $8100 bill due in April 2003 (T8: 67-70). Because bills were not paid, in May 2004, Jett went to Tracie Burrow at the Learning Exchange (T8: 72). Burrow then discovered that she, as chief financial officer, had authorized payment in 2002 for a website to IM Consulting, a company owned by James (T8: 91, 113). The contract, however, was signed by Mark Logan who was with another company and disclaimed that it was his signature (T8: 86-87, 95). When in July 2004, chief executive officer Tammy Blossom realized that James owned IM Consulting, she fired him (T8: 117-118).

- In early fall of 2003, James proposed to the Learning Exchange that he get an MBA degree from Harvard while still working for the company remotely (T8: 103-104). Mr. Keown gave his employer an acceptance letter from Harvard Business School and was allowed to work remotely from Massachusetts (T8: 108-109). This letter was a fake (T9: 20). In 2004, Mr. Keown was registered for one class at the Harvard Extension School which could have been taken on-line (T9: 9, 16).

16

Defense counsel filed a motion in limine and objected at trial to the testimony of all "bad-act" witnesses (T8: 7-8). No limiting instruction was given at the time of the admission of this evidence. In the final instructions, the trial judge specifically named "Harvard" and the "Learning Exchange" and stated that use of this evidence was limited to evaluating Mr. Keown's "state of mind, intent and his motive" (T13: 116). Defense counsel objected to the instruction because the trial judge drew the jury's attention to Harvard and the Learning Exchange (T13: 148-149).

Admission of prior bad act evidence is restricted to purposes such as common scheme, pattern of operation, absence of accident or mistake, identity, intent or motive, and is admissible if relevant only when its probative value outweighs the risk of unfair prejudice to the defendant. Because this evidence was more prejudicial than probative, the state appeals court erred when it failed to correct for the trial judge abusing her discretion in admitting the acts.

With respect to events at the Learning Exchange, a connection to Julie's death is entirely speculative. These events, which took place in 2002 and 2003 in Missouri were too remote in time and space to be probative of James's motive to kill his wife, and had nothing to do with events happening in Massachusetts in September 2004. The only connection events at James's workplace would have to a

17

motive to kill his wife is the speculation that Julie did
not know James was fired from the Learning Exchange. The
evidence on this point, however, was that Julie indeed knew
things were not going well with the Learning Exchange (T4:
222). In July or August 2004, Julie had a conversation with
her mother about James's problems with the Learning Exchange
which could have been a way to ease into breaking the news
of the job change to her parents (T4: 219, 222, 235).

There was also evidence that Julie was involved in the
deception about James's attendance at Harvard. She told
numerous persons who knew that James had never finished
college that he was at Harvard to finish his undergraduate
degree, but she told others he was attending Harvard
Business School (T4: 210-211, T12: 172). Julie sent an email
to someone she did not know personally, (T12: 178), before
her death state that James was going to school and employed
full-time, but there is a real question whether she would
have been truthful to a virtual stranger (T12: 180).

More importantly, there was absolutely no evidence at
trial that James was in fear of being found out by his wife
for these employment and Harvard matters. Nor was there
evidence that he was actually about to be or would ever be
found out by his wife for these matters. Thus, there was no
nexus between the lies and murder. This evidence had little
probative value, and the prejudice in admitting it was so
overwhelming as to make the resulting conviction a denial of
federal due process. There was absolutely no other evidence

18

on the issue of motive other than these prior bad acts. The erroneous admission of this evidence provided the linchpin for the jury verdict of murder in violation of James's federal due process rights. U.S. Const. amend. XIV, §1. The judgement was substantially swayed by the error.

C. Julie Keown's statements and emails

The Commonwealth introduced the following statements/emails of Julie for proof of James's state of mind and motive to kill her:

- An email from Julie to James dated January 20, 2004, evidencing surprise that the Learning Exchange had not paid Jason Jett (T11: 24-26).
- An email sent to Regina Blevin from Julie on September 3, 2004, which stated that her husband is a wonderful person and that he "is going to school at Harvard to finish his bachelors and working full time" (T13: 17-18).
- An email to Jill Lawson on September 1, 2004, stating in part that "James keeps wanting me to drink Gatorade" (T12: 137-138, T13: 17-18).

The trial judge instructed the jury that Julie's statements other than to health care providers, were in evidence only for the limited purpose of evaluating the defendant's motive, his state of mind, or for the limited purpose of evaluating whether Julie's state of mind was consistent with or inconsistent with suicide (T13: 117). Defense counsel objected to this instruction with respect to

19

Mr. Keown's intent (T13: 149).

There was evidence that James was aware of Julie's knowledge regarding the Jason Jett issue because of the email exchange between the couple. There was evidence that James was aware that Julie thought she should be drinking Gatorade but did not like it due to Julie's friend Heather LeBlanc's testimony (T12: 166). In order for statements of victim to be probative of the defendant's state of mind with respect to motive, the state of mind must be known to the defendant. There was no evidence, however, that James was aware of the state of mind expressed in Julie's email to Bliven.

Even if James's knowledge of Julie's state of mind in the Bliven email could be inferred, the state of mind of the victim known to the defendant must be such that the defendant would be likely to respond to it by killing the victim. The attitude at issue in cases where the state of mind of the victim is deemed probative of a defendant's motive is contempt or hostility. But that was far from the case here where the email statements evidenced a good relationship between the spouses. Julie's state of mind with regard to any of the emails allowed into evidence is not relevant to James's motive to kill as it would be with animus or marital discord. This is especially true in light of there being no evidence that James was in fear of being found out by his wife for the employment and Harvard matters. Thus, there was no evidence that James was likely

20

to respond to Julie's state of mind on these issues and the evidence was inadmissible for James's state of mind under the state-of-mind exception.

The Commonwealth introduced Julie's a portion of Julie's web browsing history and emails for proving that her state of mind was not suicidal. A murder victim's state of mind becomes a material issue if the case concerns the issue of suicide. Yet, it must be the defense that opens the door to suicide. Here, the prosecution was the first to bring up suicide in opening argument by stating, "You will see and hear evidence right up until the day she entered that coma, Julie Keown wanted to live" (T4 24-25). In fact, at no time during the trial did the defense attempt to enter evidence to show Julie as suicidal. Defense counsel stated clearly in response to the prosecution's opening argument, "We may never know if this was a suicide, we may never know if this was an accident" (T4: 29).

Still, over defense objection, (T10: 138, 145), the Commonwealth introduced a spreadsheet found on Julie's work computer that was last accessed on September 1, 2004 (T10: 141). This spreadsheet contained questions regarding the chronic kidney diseased she had been diagnosed with earlier in the summer, protecting the couple's finances, and pregnancy options (T10: 142-143). Over defense objection, (MIL2:62, T10:145), the Commonwealth introduced evidence that the websites Julie visited shortly before entering the hospital on September 4, 2004, included kidney-related and

21

illness-related sites including "steroidal psychosis", and many doll-making websites (T11: 10-13, 15-20). The Commonwealth introduced evidence that Julie did Google searches on kidney and illness related keywords, including "prednisone psychosis" (T11: 16-19). The Commonwealth was trying to show that Julie was researching her illness in order to negate a theory of suicide.

The Commonwealth's email evidence on the issue of suicide was from Julie's friends stating she was waiting for MRI results, and using the phrase "knock on wood" regarding her medical condition. An email to Kim Easley indicated that Julie was feeling ill that day, "but we have to go back to the ER if she doesn't get much better this evening" and that Julie had an MRI scheduled for the following Tuesday, and that Julie hopes and plans "to be back at it on Tuesday" (T11: 29-30).

Julie's emails and cherry picked web browsing history admitted on the issues of suicide and James's motive were extremely prejudicial. The probative value of the emails were dependent upon whether Julie's emails were truthful, a point raised by the trial judge (MIL: 60-61). Julie was not truthful when she emailed numerous persons who knew (as she did) that James had never finished college that he was at Harvard to finish his undergraduate degree but wrote to others he was attending Harvard Business School. Before admitting such explosive evidence, the trial judge must exercise discretion and balance the probative value of such

22

evidence against the prejudicial impact of the defendant's case.

These emails and the web browsing history were not probative of James's motive and only marginally probative of Julie state of mind on the suicide issue, but were vastly more prejudicial in this highly circumstantial case than they were probative. It is surmise and conjecture to posit that just because something was said in an email, it accurately reflected the person's state of mind. It is even further over the line into conjecture to surmise that Julie was or was not suicidal from her web browsing history. On the other hand, the jury was likely to over-inflate the importance of Julie's email statements and what websites she visited on the issue of suicidality. It is an open question at best whether a lay jury can actually limit their consideration of such emotion-stirring evidence to "state of mind" instead of actually using Julie's words for their truth. In addition, there was no expert evidence introduced at trial that would equate a person's state of mind regarding suicide to their emails or web browsing history. The jury was free to use this information in an intensely prejudicial way. The trial judge abused her discretion. This inflammatory evidence rendered the trial fundamentally unfair, thus violating the Due Process Clause. See U.S. Const. amend. XIV, §1.

Defense counsel objected at trial prior to Julie's emails and web browsing history coming into evidence (T4:

23

159, T8: 7, T10: 138, 145, T11:23). After the Commonwealth
admitted Julie's emails, defense counsel offered a numbered
of her emails into evidence showing that she was applying
for jobs, and that she told some people that James was going
to Harvard as an undergraduate and other people that he was
accepted to Harvard Business School (T11: 46-48, 131-136).
The emails offered by the defense also referred to the good
relationship Julie said that she had with her husband, and
her command of the couple's finances (T11: 144-146). In
response to the improper evidence, James did not waive his
appellate rights by pursuing rehabilitation.

Whatever use defense counsel made of Julie's emails and
web browsing history, such benefit was vastly outweighed by
the prejudice of this wrongly admitted evidence. This is
especially true because the trial judge did not allow
defense counsel to put into evidence an email from Julie to
the effect that she would be happy to move to Boston to get
away from her mother (T12: 117-125). Given that the
Commonwealth's theory was that James had moved to Boston for
some nefarious purpose, (T4: 16), this email would have been
very probative in debunking this theory as a motive for
murder. A defendant in a criminal trial has a due process
right under the Fourteenth Amendment of the United State
Constitution to "a meaningful opportunity to present a
complete defense." California v. Trombetta, 467 U.S. 479,
485 (1984). By excluding the email, James was denied his
federal due process rights to present a complete defense.

24

D. Evidence of Google searches on the Sony VAIO.

Winrow, the Commonwealth's computer forensics expert, testified at trial to finding files on the Sonly VAIO laptop corresponding to Google searches for poisons. These searches were done under the "JKeown" user name (T9: 189, 191). This user name could reference both James and Julie as both could be "JKeown". In fact, Julie's user name on both of her Cerner laptops began with "JKeown". None of the searches under "JKeown" concerned EG or antifreeze.

On July 26, 2004, there was a Google search for how to make ricin (T9: 190, 193). During a similar time period there was another Google search concerning how to make ricin (T9: 193-194). On August 17, 2004, to August 18, 2004, there were Google searches on the topic of poisons, poisoning and toxicology (T9: 194-198, 201).

There was only one search for "antifreeze" on the Sony VAIO. Winrow testified that the Google search was "antifreeze death human" and it took place on August 18, 2004 at 2:44 PM Greenwich Mean Time (T9: 213-214). There was no evidence under which user name this search happened, nor was there any direct evidence as to who did this search. Winrow could not determine who was at the keyboard during any of these searches (T10: 32).

Trial counsel brought a motion in limine to exclude evidence of these Google searches because they were more prejudicial than probative, and objected at trial (T9: 142-144). Even if such evidence was relevant for purposes other

25

than propensity evidence, to be admissible its probative value must not be outweighed by its prejudicial effect. Here, the evidence of the Google searches was more prejudicial than probative because there was no evidence who did the actual searches because the Sony VAIO was available to James and Julie during the August 2004 period of the searches. In contrast to the assumption made by the Massachusetts Appeals Court, at no time was evidence presented that James had sole control of the Sony VAIO, only that one of Mr. Keown's work laptops had connected to a wireless network called "Kaiser Soze" and that James took the laptop with him when he moved back to Missouri. The admission of this evidence was an abuse of discretion and severely prejudiced Mr. Keown. In addition, the appeals court misunderstanding about who had access to the Sony VAIO compounded the abuse so that a new trial is required.

For all of the above reasons, the trial judge's erroneous admission of the Kaiser Soze evidence, James's prior bad acts, Julie's statements and the Google searches "so infuse[d] the trial with inflammatory prejudice that it rendered a fair trial impossible." Petrillo v. O'Neill, 428 F.3d 41, 44 n.2 (1st Cir. 2005); U.S. Const. amend. XIV, §1; see e.g. Estelle v. McGuire, 502 U.S. 62, 72 (1991); Cupp v. Naughten, 414 U.S. 141, 147 (1973). These errors are not harmless beyond a reasonable doubt and require a new trial. See Chapman v. California, 386 U.S. at 24.

III. **The Massachusetts Appeals Court violated the petitioner's right to due process in allowing to stand the jury's ability to infer malice/intent to kill from the use of a weapon which was not inherently dangerous.**

The trial judge instructed:

Malice, as it applies to deliberately-premeditated murder, means an intent to cause death. As a general rule, you may infer that a person who intentionally uses a dangerous weapon on another is acting with malice.
(T13: 126-127)

The trial judge went on to define "poison" as a dangerous weapon if it was capable of causing "serious injury or death as used" (T13: 127). She then explained, "[t]he law considers any item to be a dangerous weapon if it is intentionally used in a way that it is reasonably capable of causing serious injury or death to another person" (T13: 127). The trial judge then defined for the jury when EG would be a dangerous weapon by comparing it to a lighted cigarette used to burn someone or a pencil used to poke out an eye (T13: 127-128). Trial counsel objected to this instruction because it impermissibly lowered the Commonwealth's burder (T13: 151).

Any ordinary item can become a dangerous weapon if, as used, it could cause serious injury. The question here is whether EG, an ordinary item found in most garages, which is not designed to be a weapon and is dangerous only as used can support an inference of first prong malice: intent to

27

kill.

Mr. Keown had a due process right under the Fifth and Fourteenth Amendments to the United States Constitution to be convicted only on proof of every element of the crime beyond a reasonable doubt. See Francis v. Franklin, 471 U.S. 307, 313 (1985); In re Winship, 397 U.S. 358, 364 (1970). A judge cannot use evidentiary presumptions in a jury charge that have the effect of relieving the Commonwealth of its burden to persuade the jury of every element of the crime beyond a reasonable doubt. A permissive inference such as this one violates federal due process rights "only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury." Francis v. Franklin, 471 U.S. at 315.

The conclusion of intent to kill from intentional use of EG is not reasonable. EG is the sort of common everday item akin to a pencil or a lighted cigarette where its intentional use against another equates more readily with an intent to harm rather than an intent to kill. The use of this item on another does not rationally relate to an intent to kill, yet that was the judge's instruction (T13: 126-127). Under the circumstances of this case, the Appeals Court's permissive inference equating intentional use of this non-inherently dangerous item with an intent to kill violated due process. This particular permissive inference gave too little protection to the Winship standard. The charge as a whole did not cure the error, see Francis v.

Franklin, 471 U.S. at 315, and because a reasonable juror
may have convicted James of first-degree murder without
finding an intent to kill beyond a reasonable doubt, a new
trial is required. This error was not harmless beyond a
reasonable doubt. See Chapman v. California, 386 U.S. 18, 24
(1967).

**IV. The Massachusetts Supreme Judicial Court violated the petitioner's federal rights by failing to uphold federal decisions related to the search of digital devices.**

The petitioner understands that this Court does not normally review state questions of search and seizure under the Fourth Amendment. The details in the present case, however, involve complex searches of digital devices that states have been unable to effectively address due to the lack of guidance from Federal Courts and the US Supreme Court. Therefore, the petitioner asks this Court to review this argument in light of the Fourth Amendment. A more robust discussion as to why this Court should review the petitioner's Fourth Amendment claims will be offered after the Argument.

## A. The warrant to search the Sony VAIO laptop was not supported by probable cause.

The Fourth Amendment to the United States Constitution requires that a search warrant issue only on a showing of probable cause. The warrant to search the Sony VAIO was not supported by probable cause because there was absolutely no information in the four corners of the affidavit that this particular defendant had used his computer to search for murder-related information.

The first time Mr. Keown's Sony VAIO computer was

mentioned in the affidavit of State Police Lieutenant James Connolly is a statement that the program manager of the radio station in Jefferson City, Missouri where Mr. Keown had worked called Mr. Keown's mother to pick up his belongings that had been left at the station after he was arrested at work, including the Sony VAIO. Connolly then noted that this Sony VAIO was mailed to Mr. Keown's first trial lawyer, Attorney Carney. The computer mentioned in the affidavit as one that Mr. Keown regularly worked on was not the Sony VAIO, but a Learning Exchange computer and a Toshiba laptop.

The heart of Connolly's affidavit on the issue of probable cause to believe that evidence of murder was to be found on the Sony VAIO was his assertion that through his years of experience investigating serious crimes, he knew that "perpetrators often use the Internet to research, and in effect, trouble shoot murder plans." Connolly asserted that "significant" information about poisoning by ethylene glycol was available on the Internet. Mr. Keown was mentioned by name in this paragraph only to state that "individuals such as Keown who are computer literate often store their personal financial information, including their will, electronically on computer files."

Probable cause requires a substantial basis for concluding that the items sought in a warrant application are related to the criminal activity under investigation and that these items reasonably may be expected to be located in

the place to be searched. In making this determination, the
affidavit should be read as a whole and in a non-technical
manner. Read as a whole, the Connolly affidavit in support
of this warrant gave no information supporting any inference
that Mr. Keown used the Sony VAIO for any purpose related to
the crime of murdering his wife. Rather, the four corners of
the affidavit provided the Waltham District Court with only
surmise and speculation that Mr. Keown used the Sony VAIO to
search ethylene glycol in particular or murder in general,
and there was no nexus between murder, computers, or crime
and the financial papers referenced in the warrant.

The Massachusetts Supreme Judicial Court determined
that since the court believed that Mr. Keown had used a
**computer** (not the Sony VAIO) to create false documents and
because the case was over a decade old, the inferences from
the Connolly affidavit were reasonable.

Short of the "fact" that Mr. Keown had previously used
a computer to perform suspicious activity, the only factor
remaining to support the motion judge's analysis is the
general observation that "through police investigations it
is known that criminals use computers to further their
activities." While an officer's training and experience can
be considered in determining probable cause, it cannot be
the substitute for a lack of probable cause. See United
States v. Schultz, 14 F.3d 1093, 1097 (6th Cir. 1994);
United States v. Kosta, 2013 WL 5934030, *5 n.5 (D.Mass
2013) (granting motion to suppress due to lack of probable

cause). "To permit a search warrant based solely upon the self-avowed expertise of a law-enforcement agent, without any factual nexus to the subject property, would be an open invitation to vague warrants authorizing virtually automatic searches of any property used by a criminal suspect." United States v. Rosario, 918 F. Supp. 524, 531 (D.R.I. 1996). The generalized observations that perpetrators of murder use computers to further their activities must be combined with some information specific to Mr. Keown's use of the Sony VAIO to reach the level of a probable cause determination. See United States v. Ribeiro, 397 F.3d 43, 50-51 (1st Cir. 2005). Missing here is any specific connection between Mr. Keown and criminal use of the Sony VAIO and computers in general.

Because the warrant to search the Sony VAIO lacked probable cause, the denial of the motion to suppress was error. The error in admitting the computer search evidence from the Sony VAIO - the strongest evidence of guilt that the Commonwealth had -- was not harmless beyond a reasonable doubt and a new trial is required.

B. The warrant allowing the search of the data in the Sony VAIO laptop did not particularly describe the search to be done.

The search warrant authorizing the the forensic search of the Sony VAIO laptop by its terms envisioned a general search, not limited by protocols or keywords. The warrant allowed search of the entire laptop computer for the

33

specific files referenced in 47(a)-(k) of the warrant application. "I seek permission to seize the... Sony VAIO... and search for the following electronic files:". Paragraph (f) of the warrant application provided for a search of "any electronic file paper document specifically pertaining to the Internet activity of Keown". This paragraph purported to be limited to "computer files of the type described in Paragraph 2 of this affidavit". Paragraph 2 of the affidavit, however, simply described the Sony VAIO laptop and the hard drive and did not in any way concern types of computer files. Thus, the four corners of the affidavit requested a general search of all the files contained on the entire laptop.

In addition, the actual search of the Sony VAIO laptop was done using keywords that were compiled prior to the warrant application but not submitted in the warrant application, as well as keywords added by the prosecutor and the computer examiner after the warrant was issued (MTS3: 95-96). It is undisputed that the search terms ultimately used to search the Sony VAIO were not separately provided to a judge when police applied for a search warrant (MTS4: 36).

Prior to trial, Mr. Keown brought a motion to suppress evidence obtained from the search of the laptop computer on the basis that the warrant failed to describe the items to be seized with sufficient particularity. This motion was denied. On appeal to the Massachusetts Supreme Judicial Court, Mr. Keown again argued that he search warrant for the

laptop lacked particularity and thus was an impermissible
general warrant under the Fourth Amendment. Specifically,
Mr. Keown argued that an ex ante search protocol was
necessary in order to make a digital search warrant comport
with the particularity requirement of the Fourth Amendment.
"While recognizing that the searches of electronic devices
present major constitutional hazards" and citing Riley v.
California, 134 S. Ct. 2473, 2489-2490 (2014), the
Massachusetts Supreme Judicial Court nevertheless declined
to adopt ex ante search protocols for searches of electronic
devices. The only reasoning provided for this conclusion was
that because the search was conducted reasonably and took
place more than a decade ago, the laptop computer warrant
did not lack particularity because it did not include ex
ante search protocols.

The Massachusetts Supreme Judicial Court has seriously
misinterpreted the Fourth Amendment as applied to searches
of digital devices by rejecting the application of ex ante
restrictions on search warrants for digital evidence. The
Fourth Amendment "was the founding generation's response to
the reviled 'general warrants' and 'writs of assistance' of
the colonial era, which allowed British officers to rummage
through homes in an unrestrained search for evidence of
criminal activity." Riley, 134 S. Ct. at 2494. Warrants
allowing unconstrained rummaging searches of digital
devices, as in the present case, must be prohibited by the
Fourth Amendment because they are closely analogous to the

35

reviled general warrants of Colonial times.

Given the huge amount of information on digital devices and the fragmented way it is stored, there is a high likelihood that data relevant to an investigation will be mixed with irrelevant data. See In re Search of 3817 W. West End, 321 F.Supp. 2d 953, 958 (N.D. Ill. 2004). This situation poses an unacceptably large risk that investigators will feel entitled to open any file among the millions contained on a smartphone or computer hard drive. See United States v. Schesso, 730 F.3d 1040, 1042 (9th Cir. 2013) (recognizing the risk that "identifying seizable electronic evidence could become a vehicle for the government to gain access to a larger pool of data that it has no probable cause to collect"). Unlike searches in the physical realm, where an investigator could not search for a stolen large-screen television in a medicine cabinet, investigators can be tempted, as they were in the present case, to search every file on a digital device. See United States v. Galpin, 720 F.3d 436, 447 (2d Cir. 2013) (limitations on what to search "are largely absent in the digital realm, where the size or other outwardly visible characteristics of a file may say nothing about its content").

Freedom to open any file on a device as a matter of routine cannot satisfy the Fourth Amendment's particularity requirement. To hold otherwise would make a nullity of the

Fourth Amendment's prohibition on general warrants and exploratory rummaging. For this reason particularity in the digital context must receive special attention.

Properly implemented, ex ante warrant restrictions are an effective tool to reduce the privacy invasion inherent in searches of digital devices. See United States v. Comprehensive Drug Testing, Inc., 621 F.3d 1162, 1176 (9th Cir. 2010). In the present case, non-relevant files, including attorney-client privileged files, were searched by investigators. The Commonwealth's computer experts spent months reviewing the digital devices in their control. To work with a judge to establish clear guidelines as to what was and was not searchable may have been an inconvenience, but it in no way would have unduly hindered the Commonwealth's ability to investigate and would have clearly protected Mr. Keown's Fourth Amendment rights. This Court must correct the Massachusetts Supreme Judicial Court's erroneous interpretation of the Fourth Amendment and require that police must show a genuine effort to limit themselves to a particularized search before the issuance of a search warrant for a digital device.

C. Reasons for why this Court should review the
   petitioner's Fourth Amendment claims.

The Fourth Amendment of the United States Constitution
requires that a warrant identify with particularity the
place to be searched and the items to be seized. U.S. Const.
amend. IV. The US Supreme Court has recognized that the
Fourth Amendment applied differently to searches of digital
devices than to searches of physical places. See Riley, 134
S. Ct. at 2484-85. And the Supreme Court has also recognized
that the pervasiveness of digital devices in people's lives
and the amount of information contained therein necessitates
more Fourth Amendment protections, not fewer.

Applying the Fourth Amendment to searches of digital
devices using past case law designed for physical spaces is
difficult for five main reasons.

1. Digital devices cannot be analogized to physical
   spaces.

Case law concerning physical spaces, the foundation on
which Fourth Amendment law has been based, simply isn't
directly applicable to searches of digital devices. See e.g.
United States v. Ganias, 824 F.3d 100, 212-215 (2nd Cir.
2016) (en banc) (analyzing the difference between digital
and physical spaces). Electronic files "are not maintained,
like files in a file cabinet, in discrete physical locations
separate and distinct from other files" but rather are
"fragmented" on the device. Id. at 213. In addition,

38

electronic devices store not only files, but additional information about a given file, including metadata about the file's authorship and creation, and prior versions of the file. Id.

## 2. Digital devices play a unique and unprecedented role in people's lives and society at large.

The Supreme Court recognized the uniqueness of digital devices compared to anything ever seen previously when it pointed out that "[a] phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form" Riley, 134 S. Ct. at 2491. A laptop -- small, portable, ubiquitous and capable of story many terabytes of information -- is fully equivalent to a smartphone in this regard.

## 3. Digital devices contain extremely large quantities of information.

Digital devices contain vastly larger amounts of information than a typical house could hole. See Riley, 134 S. Ct. at 2491, 2493 (search of a phone would "typically expose to the government far more than the most exhaustive search of a house."). The Library of Congress contains ten terabytes of information, which will be the size of an average hard drive in the near futures. See Paul Ohm, Massive Hard Drives, General Warrants and the Power of Magistrate Judges, 97 Va. L. Rev. Brief 1, 4 (2011) The vastness of the storage potential of a typical computer hard

39

drive leads to another problem, which is that one digital device can store information dating back many years. This situation allows an unfettered government search to conduct what amounts to an archeological dig into a user's past.

**4. Digital devices contain many types of data that would not be found together in a physical space.**

In contrast to a physical space like a briefcase, pants pocket, or a purse, a digital device stores location history, call logs, text messages, e-mail accounts, health records, financial records, appointments, search and browser histories, personal files, contacts, and directories, voice memoranda, photographs, and more. Computers can also function as points of seamless access to data on a remote server, which can further expand the range of information a law enforcement search of data could reach.

**5. Digital devices contain data that is different in kind than exists in physical spaces.**

Whereas a search of a file cabinet or wallet would reach items consciously put there by someone, computers collect and store data the user has not affirmatively chosen to download and save, for example, cache files, which are "files automatically stored on a user's hard drive by a web browser to speed up future visits to the same websites, without the affirmative action of downloading." In re U.S.'s Application for a Search Warrant to Seize and Search Electronic Devices from Edward Cunnius, 770 F.Supp. 2d 1138, 1145 (W.D. Wash. 2011). Similarly, once information is

present on a digital device, it is difficult or impossible for a user to destroy or delete this information. See id. Unlike papers removed from a file cabinet and discarded, remnants of an electronic file routinely remain on a drive even after the file has been deleted. See United States v. Gourde, 440 F.3d 1065, 1071 (9th Cir. 2006). This situation is especially problematic when combined with a government search because people use their digital devices in connection with the most intimate aspects of their lives, such as sending and receiving e-mails, finding information about goods and services, conducting banking transactions, seeking personal information, and more.

As detailed above, the data on digital devices is more voluminous, of a more diverse type and serves a different function than items found in the physical world. Thus, digital devices call for greater Fourth Amendment protection than is extended to physical objects containing less or narrower kinds of data. State courts, however, have failed to properly interpret this added protection. Therefore, it is left to the Federal Courts to properly interpret how the Fourth Amendment should be applied in regards to digital devices.

## CONCLUSION

For the reasons set forth above, this Court should grant the petitioner's Petition for Writ of Hebeas Corpus.

Respectfully submitted,

JAMES KEOWN

James Keown, pro se
PO Box 43
Norfolk, MA 02056

Dated: September 10, 2019

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon Respondent at the address below on September 10, 2019, by depositing in the MCI-Norfolk depository for collection and delivery by first-class mail, postage pre-paid, as follows:

Susanne G. Reardon
Assistant Attorney General
Criminal Bureau
One Ashburton Place
Boston, Massachusetts 02108

Dated: September 10, 2019

James Keown, pro se
Petitioner
PO Box 43
Norfolk, MA 02056